# DEPARTMENT OF INSURANCE v DEALERS ASSOCIATION PLAN

## Case No. 88-0127

State of Florida, Division of Administrative Hearings

June 13, 1988

### APPEARANCES OF COUNSEL

**R. Terry Butler,** Department of Insurance, for petitioner.
**Geoffrey B. Dobson,** Meredith & Dobson, P.A., for respondent.

### OPINION OF THE COURT

ROBERT E. MEALE, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice, final hearing in the above-styled case was held on April 12, 1988, in Orlando, Florida, before Robert E. Meale, Hearing Officer of the Division of Administrative Hearings.

The representatives of the parties were as follows:

(Appearances of Counsel listed above.)

## BACKGROUND

On November 24, 1987, Petitioner filed an Administrative Complaint against Respondent seeking the revocation of Respondent's certificate of authority as an administrator of such lesser penalties as provided by law.

The first count alleged that the Alarm Association of Florida Health and Welfare Benefit Plan unlawfully operated without a certificate of authority as a multiple employer welfare arrangement under the Florida Nonprofit Multiple Employer Welfare Arrangement Act, *FS* §§ 624.436-624.44, (the "Act").

First, Petitioner alleged that the services that Respondent provided to the Alarm Plan constituted the use of such methods or practices in the conduct of business so as to render Respondent's further transaction of business hazardous or injurious to insured persons or the public. Such a violation is mandatory grounds for the suspension or revocation of an administrator's certificate under *FS* § 626.891(1)(b).

Second, Petitioner alleged that the services that Respondent provided to the Alarm Plan demonstrated that Respondent was not competent, trustworthy, financially responsible, or of good personal and business reputation, in violation of *FS* § 626.8805(4). Respondent thus allegedly failed to meet a qualification for which issuance of an administrator's certificate could have been refused. Such a failure is permissible grounds for the suspension or revocation of a certificate under *FS* § 626.891(2)(e).

Third, Petitioner alleged that Respondent operated or maintained the Alarm Plan without a certificate of authority in violation of the Act. Such a violation is grounds for a cease and desist order and an administrative fine of not less than $5,000 or more than $10,000 under *FS* § 624.437(4)(a) and (b).

The second count alleged that the Professional Wrecker Operators of Florida Health and Welfare Benefit Plan unlawfully operated without a certificate of authority as a multiple employer welfare arrangement under the Act. The second count alleged violations of *FS* § 624.437(4)(a) and (b), § 626.891(1)(b), and § 626.891(2)(e), on the same grounds as set forth in the first count.

The third count, as amended at the hearing, alleged that Respondent failed to file timely, or cause to be filed timely, the annual financial statements of the Florida Automobile Dismantlers and Recyclers

**169**

Health and Welfare Benefit Plan in violation of the above-cited *FS* §§ 626.891(1)(b) and 626.891(2)(e).

The fourth count, as amended at the hearing, alleged that Respondent failed to file timely, or cause to be filed timely, the annual financial statements of the Florida Independent Automobile Dealers Health and Welfare Benefit Plan in violation of the above-cited *FS* §§ 626.891(1)(b) and 626.891(2)(b).

The fifth count alleged that the circumstances surrounding and including the cancellation and dishonoring by the surety of the surety bond issued for the Florida RV Trade Association Health and Welfare Benefit Plan violated the above-cited *FS* §§ 626.891(1)(b) and 626.891(2)(e).

On December 15, 1987, Respondent served its Answer to Administrative Complaint and Petition for Formal Proceedings before the Division of Administrative Hearings.

Petitioner called two witnesses and offered into evidence 28 exhibits. Respondent called one witness and offered into evidence two exhibits. The parties jointly offered into evidence one exhibit. All exhibits were admitted into evidence.

The transcript was filed on April 27, 1988. Both parties filed proposed recommended orders. Treatment accorded the proposed findings is detailed in the Appendix.

## FINDINGS OF FACT

1. Respondent is Reinecke Insurance Agents, Incorporated, doing business as Dealers Association Plan. Respondent is also known as the Reinecke Agency, Inc., doing business as Dealers Association Plan.

2. Respondent began business on March 1, 1978. At all times material hereto, Respondent has held a certificate of authority, issued by Petitioner, authorizing Respondent to engage in business as an administrator. *Alarm Association of Florida, Inc.*

3. The Alarm Association of Florida, Inc. (Alarm) is a trade association that was incorporated on July 12, 1976, as a Florida not-for-profit corporation.

4. Alarm was organized to provide an opportunity for its members to exchange ideas and share information concerning trade practices, business conditions, technical developments, and related subjects concerning the electrical protection industry.

5. Alarm has two primary types of membership. Regular Membership is open to any individual, partnership, firm, or corporation

170

engaged in the business of installing or providing alarm service in the electrical protection field for one year preceding the application. Associate Membership is open to any individual, partnership, firm, or corporation that is not engaged directly in the electrical protection business, but may supply goods or services to Regular Members. Officers and directors of Alarm are selected by the voting members, which are limited to Regular Members. About 25% of Alarm's membership consists of nonvoting members.

6. Sometime prior to November 1, 1985, a representative or representatives of Alarm requested Respondent to make a presentation concerning an employee benefit plan that Alarm was considering establishing. Alarm had previously formed a committee to investigate the feasibility of sponsoring such a plan, which its members could join.

7. Alarm thereafter decided to sponsor an employee benefit plan and use Respondent as the plan administrator. Respondent prepared or caused to be prepared the necessary documents. These documents included a trust agreement between various persons, as trustees (Alarm Trustees), and Alarm (Alarm Trust or Alarm Trust Agreement); the Alarm Association of Florida Health and Welfare Benefit Plan (Alarm Plan); and the Administrator Agreement between Alarm and Respondent. Each document was executed and delivered on November 1, 1985.

8. The Alarm Trust Agreement states that the Alarm Trust is to be funded by the contributions made by the members of the Alarm Plan and the Alarm Trust funds are to be maintained as a reserve against claims by Alarm Plan participants. The Alarm Trust Agreement provides that Alarm may remove an Alarm Trustee at anytime and replace an Alarm Trustee who has resigned or been removed. The Alarm Trust Agreement states that the Alarm Plan Administrator, which was designated as Respondent, shall administer the day-to-day operations of the Alarm Trust, *inter alia,* to pay claims, provide "consulting and actuarial services necessary for the continuing successful operations of the [Alarm] Plan," and establish procedures for "Employee Contributions." "Employees" are "all qualified members of [Alarm] and their employees."

9. The Administrator Agreement, which is authorized by the Alarm Trust Agreement, authorizes Respondent to use the Alarm Trust funds to review and pay claims and pay premiums on policies purchased by the Alarm Plan or Alarm Trustees. Among its various "powers and duties," Respondent is to demand monthly from the Alarm Trustees such funds "prudently required" for the payment of claims; do all

171

things prudent for the daily administration activity of the Alarm Trust; make or cause to be made such reports, and file such information with appropriate public authorities, as may be required by the Trust by applicable laws; and negotiate and purchase such excess insurance or reinsurance as Respondent and the Alarm Trustees deem appropriate to compensate the Alarm Plan participants if claims exceed Alarm Trust assets. The Administrator Agreement states that Respondent is to receive 20% of the monthly contributions as its administrative fee.

10. The Alarm Plan provides a detailed statement of the available benefits and various administrative matters, including claim procedures. In general, the Alarm Plan covers a wide range of medical, accident, and dental expenses.

11. In capital letters on the first page, the Alarm Plan states:

This is a self-funded, trade association member employee benefit plan established under Public Law 93-406 [Employee Retirement Income Security Act ("ERISA")], available only to qualified participating employers and their qualified employee participants. It is not available for individual coverage . . .

The Alarm Trust Agreement likewise states that it "shall be interpreted in a manner consistent with its being . . . a Welfare Benefit Plan pursuant to . . . ERISA . . ."

12. Each Alarm member enrolled in the Alarm Plan makes a monthly contribution, which is paid to Respondent. The contribution is equal to the number of employees of the enrollee who have elected to participate in the Alarm Plan multiplied by the contribution rate. The Alarm Trustees set the contribution rate based upon the advice of Respondent. On at least one occasion, the Alarm Trustees increased the rate upon the advice of Respondent. At all times, the Alarm Trustees and Respondent have intended to keep the Alarm Plan and Alarm Trust actuarially sound.

13. When Respondent first began business, it employed an actuarial service to set contribution rates. After a few years, Respondent terminated the service and thereafter recommended rate increases or initial rates for the various plans that it administered only as the need became apparent.

14. Respondent uses the contributions to pay claims that it has received. As long as Respondent has determined that the claims are valid, the Alarm Trustees do not review the claims. The Alarm Trustees consider a claim only when a participant appeals a rejected claim. Respondent also uses the contributions to pay itself its 20%

172

administrative fee and any reinsurance premiums due third-party insurers. Respondent pays any remaining funds to the Alarm Trustees, who hold such funds in the Alarm Trust as reserves against future claims.

15. The Alarm Trust is liable for all claims. If the valid claims presented to Respondent exceed the contributions received for that month, the Alarm Trust provides the difference. However, the Alarm Trustees have reinsurance under which third-party insurers are liable to pay any claim in excess of $25,000, but not more than $1,000,000.

16. Since the Alarm Plan has been adopted, Respondent and Alarm have solicited enrollees, such as by direct mail. In the case of new enrollees that are not already members of Alarm, Respondent may take an Alarm Plan application and Alarm membership applications at the same time.

17. In April, 1988, Alarm comprised 425-450 members. A couple of years ago, Alarm had only about 65 members. About 85 members have enrolled in the Alarm Plan. These enrollees are all employers. About 300 employees participate in the Alarm Plan. All of these employees are employed by enrolled employers.

18. The record fails to disclose whether all of the enrollees are voting members of Alarm. Petitioner's Exhibit Number 11 lists the names of the enrollees. It appears from the names of the businesses that all, or nearly all, of them qualify for voting membership in Alarm.

19. On advice of counsel, the Alarm Plan has never obtained a certificate of authority pursuant to the Act. Neither Respondent, Alarm, the Alarm Trustees, or the Alarm Plan has ever attempted to comply with any provisions of the Act, based on the position that ERISA preempts the Act.

20. That Alarm Plan is not fully insured and has not exemption from the Secretary of Labor. *Professional Wrecker Operators of Florida, Inc.*

21. The Professional Wrecker Operators of Florida, Inc. (Wrecker) is a trade association that was incorporated on May 18, 1977, as a Florida not-for-profit corporation.

22. Wrecker was organized to serve as a clearinghouse of trade information for its members, inform its members of applicable laws and legislative bodies of its members' views, and provide its members with an opportunity to learn about and assist each other.

23. Wrecker has two classes of membership: active, which is limited to professional wrecker operators, and associate, which extends to

"affiliated industry person and companies in sympathy with [Wrecker's] precepts." Only active members may vote.

24. Sometime prior to November 26, 1984, a representative or representatives of Wrecker requested Respondent to make a presentation concerning the possibility of Wrecker sponsoring an employee benefit plan. Wrecker thereafter decided to sponsor a plan and use Respondent as the plan administrator. Respondent prepared or caused to be prepared the necessary documents. These documents included a trust agreement between various persons, as trustees (Wrecker Trustees), and Wrecker (Wrecker Trust or Wrecker Trust Agreement); the Professional Wrecker Operators of Florida Health and Welfare Benefit Plan (Wrecker Plan); and the Administrator Agreement between Wrecker and Respondent. Each document was executed and delivered on November 26, 1984.

25. Except for the deletion of Paragraph 8.2 in the Alarm Trust Agreement, the Wrecker Trust Agreement and Alarm Trust Agreement are identical in all material respects. The provisions of the Wrecker Administrator Agreement and Alarm Administrator Agreement are identical in all material respects. The Wrecker Plan and Alarm Plan are identical in all material respects.

26. The facts set forth in paragraphs 12-16 above with respect to Alarm were identical with respect to Wrecker and are incorporated by reference herein.

27. As of October 30, 1987, the Wrecker Plan had 89 enrollees. About 400 employees participated in the Wrecker Plan.

28. At least five of the enrollees in the Wrecker Plan were not members of Wrecker.

29. The Wrecker Plan never obtained a certificate of authority pursuant to the Act. The Wrecker Plan was not fully insured and had no exemption from the Secretary of Labor.

30. Because the organization documents of Wrecker offered membership to entities outside of the wrecking trade, Respondent believed that the Wrecker Plan was required to obtain a certificate of authority under the Act because the Wrecker Plan, unlike the Alarm Plan, did not qualify for an ERISA exemption from the Act.

31. On May 22, 1986, Respondent filed with Petitioner an application for a certificate of approval under the Act for the Wrecker Plan. A representative of Petitioner informed Respondent that the approval would be denied unless a certified audit and actuarial report on the plan and trust were submitted. When this information was not thereaf-

174

ter provided, Petitioner's representative advised Respondent that a withdrawl of the application would look better than a denial, which was imminent. Respondent consequently withdrew the application by letter dated February 24, 1987, and never resubmitted the application.

32. Respondent provided the Wrecker Trustees with monthly reports of contributions, claims, and other information pertaining to the current financial condition of the Wrecker Plan and Wrecker Trust. This report contained a category labeled "claims overpaid," which reflected the amount of claims for which no funds were available. At least one of the Wrecker Trustees misunderstood the category as monies that had been paid erroneously in excess of the amount of claims.

33. On or about January 10, 1988, the Wrecker Trustees met with Respondent and were informed that the deficit in the Wrecker Plan and Wrecker Trust approximated $47,000.

34. On January 22, 1988, Wrecker and the Wrecker Trustees received a letter from Respondent containing a one-page statement on Respondent's letterhead styled, "Estimated [Wrecker] Losses." Containing six entries, this statement disclosed $128,153.38 of "[e]stimated claims not paid at closing of the trust by the trustee's [sic]." The statement did not indicate the trust closing date, effective date, or the date through which the unreported claims were projected.

35. Pursuant to a Consent Order dated March 29, 1988, incorporating a Settlement Stipulation For Consent Order entered into by the Wrecker Trustees and Petitioner, the Wrecker Plan ceased operations on February 29, 1988, and, although admitting no violation of the Act, paid an administrative fine of $5,000. A certified audit through that date discloses a deficit in the Wrecker Plan and Wrecker Trust of about $168,000. *Florida Automobile Dismantlers and Recyclers Association*

36. The Florida Automobile Dismantlers and Recyclers Association (Dismantlers) is a trade association that sponsors the Florida Auto Dismantlers and Recyclers Association Health and Welfare Benefit Plan (Dismantlers Plan).

37. On September 23, 1981, Dismantlers and Respondent entered into an Administrator Agreement and Dismantlers and various trustees, including M. L. Vaughn, the president of Respondent, entered into a trust agreement (Dismantlers Trust Agreement or Dismantlers Trust) with respect to the Dismantlers Plan. The Dismantlers Plan documents, which were provided by Respondent, are substantially identical to the Alarm Plan and Wrecker Plan documents.

175

38. On or about October 3, 1983, Respondent, as administrator of the Dismantlers Plan, filed with Petitioner an application for a certificate of authority for the Dismantlers Plan under the Act, which became effective on October 1, 1983. Petitioner issued the certificate of authority.

39. Respondent handles contributions and claims for the Dismantlers Plan in the manner described above for the Alarm Plan and Wrecker Plan. As the Dismantlers Plan administrator, Respondent is obligated to file with Petitioner such reports and documents as are required under the Act. Consequently, Respondent has filed with Petitioner annual statements of the Dismantlers Plan for each fiscal year ending from 1983 through 1987.

40. An annual statement consists of three legal-size pages containing 19 questions, of which only three questions require answers that typically change each year. These questions request the number of employers enrolled in the plan, the number of participants participating in the plan, and the amount of funds handled by the plan and trust each year. The annual statement requires a copy of the most recent financial statement for the plan and trust. At the bottom of the annual statement, the person signing swears that he or she is familiar with the Act. At least two of the annual statements filed for the Dismantlers Plan from 1983 through 1987 were signed by Mr. Vaughn, as president of Respondent.

41. The fiscal year of the Dismantlers Plan and Dismantlers Trust ends on January 31.

42. On December 7, 1987, Respondent filed the Dismantler Plan's annual statement for the fiscal year ending on January 31, 1987.

43. The financial statements attached to the annual statement disclosed less than $10,000 available to pay claims, annual additions of $479,240, and annual deductions of $470,400.

44. Mr. Vaughn testified that the 1987 annual statement of the Dismantlers Plan was filed late due to the presence in Respondent's offices of Petitioner's auditors for five months. *Florida Independent Automobile Dealers Association*

45. The Florida Independent Automobile Dealers Association (Independent) is a trade association that sponsors the Florida Independent Automobile Dealers Association Health and Welfare Benefit Plan (Independent Plan).

46. On September 20, 1983, Independent and Respondent entered into an Administrator Agreement. On July 18, 1978, Independent and

176

various trustees entered into a trust agreement (Independent Trust Agreement or Independent Trust), which, although naming a different initial administrator, was witnessed by a principal of Respondent. The Independent Plan documents, which were provided by Respondent, are substantially identical to the Alarm Plan and Wrecker Plan documents.

47. On or about September 29, 1983, Respondent, as administrator of the Independent Plan, filed with Petitioner an application for a certificate of authority for the Independent Plan under the Act. Petitioner issued the certificate of authority.

48. Respondent handles contributions and claims for the Independent Plan in the manner described above for the Alarm Plan and Wrecker Plan. As the Independent Plan administrator, Respondent is obligated to file with Petitioner such reports and documents as are required under the Act. Consequently, Respondent has filed with Petitioner annual statements of the Independent Plan for each fiscal year ending from 1983 through 1987.

49. The fiscal year of the Independent Plan and Independent Trust ends on the last day of February.

50. On December 7, 1987, Respondent filed the Independent Plan annual statement for the fiscal year ending on February 28, 1987.

51. The financial statements attached to the 1987 annual statement disclosed a deficit of $289,552 available to pay claims, annual additions of about $2.8 million, and annual deductions of about $2.62 million. Attached to the 1987 annual statement is a one-page letter, signed by a trustee, stating that a rate increase of 14.3%, effective January, 1987, had produced additional funds of $270,395 and a second rate increase of 14.3%, effective October, 1987, would produce additional funds—over an unstated period of time—of $309,052, which would produce an Independent Trust surplus—at an unstated point in time—of $118,483.

52. Mr. Vaughn testified that the 1987 annual statement of the Independent Plan was filed late due to the presence in Respondent's offices of Petitioner's auditors for five months. *Florida RV Trade Association*

53. The Florida RV Trade Association (RV) is a trade association that sponsored the Florida RV Trade Association Health and Welfare Benefit Plan (RV Plan).

54. On September 1, 1983, RV and various trustees (RV Trustees) entered into a trust agreement (RV Trust Agreement or RV Trust). The RV Trust Agreement named Respondent as the administrator of the RV Plan. The RV Trust Agreement and RV Plan, which were

provided by Respondent, are substantially identical to the Alarm Plan and Wrecker Plan documents.

55. On or about October 6, 1983, Respondent, as administrator of the RV plan, filed with Petitioner an application for a certificate of authority for the RV Plan under the Act. Petitioner issued the certificate of authority.

56. Respondent handled contributions and claims for the RV Plan in the manner described above for the Alarm Plan and Wrecker Plan. As the RV Plan administrator, Respondent was obligated to file with Petitioner such reports and documents as are required under the Act. Respondent's obligations extended to ensuring that the security or surety bond required by the Act, if available, was obtained timely and posted with Petitioner.

57. Respondent regularly obtained the surety bonds for plans holding a certificate of authority under the Act, which included the Dismantlers Plan and Independent Plan, through Dealers Insurance Company.

58. Dealers Insurance Company and Respondent share the same telephone number, although they use different post office boxes. Mr. Vaughn is also president of Dealers Insurance Company, of which he is part owner. Glenna Bryan is the office manager of Respondent and office manager and vice president of Dealers Insurance Company.

59. Although operating under a certificate of authority, the RV Plan never posted with Petitioner the security or surety bond required by the Act prior to 1987.

60. By letter dated July 26, 1986, to the RV Trustees, Mr. Vaughn, on behalf of Respondent, stated, as he had at a meeting with the RV Trustees in April, 1986, that the only option available to restore financial soundness to the RV Trust was to merge the RV Plan and RV Trust into another plan and trust.

61. In 1986 or early 1987, Petitioner demanded that the RV Plan post the security or surety bond required by the Act.

62. Respondent obtained from Dealers Insurance Company a surety bond in the required amount of $100,000. The bond was duly signed on February 2, 1987, by Ms. Bryan for Dealers Insurance Company, which served as the surety on the bond.

63. The surety bond was delivered to Respondent. Ms. Bryan, as office manager of Respondent, mailed the bond to the RV Trustees with a cover letter dated February 17, 1987. The letter stated that the bond had been "issued on behalf of the State of Florida [and] is a M.E.W.A. bond that will be posted with the State . . ." The letter

178

requested that, after the RV Trustee had signed the bond as principal, he return it to Respondent.

64. The RV Trustee duly executed the bond, but, instead of returning it to Respondent, he sent it to the RV attorney, who sent it to Petitioner together with a cover letter dated March 9, 1987.

65. On March 9, 1987, RV paid the premium for the bond by check in the amount of $1,000 and payable to Dealers Underwriting Service. RV delivered the check to Mr. Vaughn. Dealers Underwriting Service, of which Mr. Vaughn is secretary and treasurer, promptly deposited the check. The premium has never been refunded to RV.

66. The bond was delivered to Petitioner without the prior specific knowledge of Respondent or Dealers Insurance Company.

67. By letter dated June 3, 1987, Dealers Insurance Company informed Petitioner that the bond was cancelled as of August 5, 1987.

68. Dealers Insurance Company has also taken the position that the bond was never properly delivered and null and void *ab initio.* Dealers Insurance Company has thus refused to honor any claims or demands under the bond.

69. Dealers Insurance Company had completed its underwriting prior to signing the bond and delivering it to Respondent. The only purposes of having the original bond returned to Respondent were to obtain a copy of a fully executed bond and ensure that it was properly filled in and filed. Dealers Insurance Company cancelled the bond because of the RV Trust's insolvency and imminent dissolution, which Dealers Insurance Company discovered due to the knowledge gained by Mr. Vaughn and Ms. Bryan in their capacity as employees of Respondent and in the course of their administration of the RV Plan.

70. By order of Leon County Circuit Court entered July 20, 1987, the RV Plan and RV Trust were voluntarily transferred by the RV Trustees to Petitioner for liquidation on the grounds of financial insolvency. Petitioner has unsuccessfully demanded payment under the bond from Dealers Insurance Company.

## CONCLUSIONS OF LAW

### I. STATE LAW

#### A. Jurisdiction

The Division of Administrative Hearings has jurisdiction over the subject matter and the parties, subject to resolution of the ERISA preemption issue presented below. *FS* § 120.57(1). In any event, state

courts have jurisdiction to resolve ERISA preemption issues. *See, e.g., Browning Corporation International v Lee,* 624 F.Supp. 555 (N.D. Tex. 1986).

## B. *Florida Nonprofit Multiple-Employer Welfare Arrangement Act*

The Florida Nonprofit Multiple-Employer Welfare Arrangement Act (previously identified as the "Act") requires that a multiple-employer welfare arrangement ("MEWA") obtain a certificate of approval from Petitioner before operating in Florida. *FS* §§ 624.436-624.44. A MEWA is an "employee welfare benefit plan or any other arrangement which is established or maintained for the purpose of offering or providing health insurance benefits . . . to the employees of two or more employers . . ." *FS* § 624.437(1).

Numerous requirements must be met for a MEWA to obtain a certificate of approval. *FS* § 624.438. One such requirement is that the MEWA be operated in accordance with sound actuarial principles. *FS* § 624.438(1)(e). Additionally, each MEWA must establish and maintain appropriate loss reserves determined in accordance with sound actuarial principles. *FS* § 624.438(4).

Each MEWA must annually deposit with Petitioner cash, securities, or a surety bond in the amount equal to 25% of the preceding 12 months' health care· claims expenditures or 5% of gross annual premiums for the succeeding year, whichever is greater, but in any event not more than $100,000. *FS* § 624.441.

Each MEWA must annually, within four months after the end of its fiscal year, file with Petitioner an annual statement, including an audited financial statement. *FS* § 624.442(1).

"Any person failing to hold a subsisting certificate of approval . . . while operating or maintaining a [MEWA]" is, for each violation, subject to an administrative fine of not less than $5000 or more than $10,000 and a cease and desist order. *FS* § 624.437(4)(a) and (b).

## C. *Chapter 626, Part VII: Administrators*

An administrator must obtain a certificate of authority from Petitioner in order to administer plans in Florida. *FS* § 626.8805(1). An administrator includes any person who adjusts or settles claims in connections with programs that provide certain life or health insurance coverage. *FS* § 626.88(1). Respondent is an administrator, within the meaning of the statute, as to the five plans described above.

Petitioner shall not issue a certificate of authority for an administrator if Petitioner determines that the "administrator or any principal

180

thereof is not competent, trustworthy, financially responsible, or of good personal and business reputation . . ." *FS* § 626.8805(4).

Petitioner shall suspend or revoke a certificate of authority if it determines that the administrator "is using such methods or practices in the conduct of its business so as to render its further transaction of business in this state hazardous or injurious to the insured persons or the public." *FS* § 626.891(1)(b).

Petitioner may, in its discretion, suspend or revoke a certificate of authority if it finds that the administrator fails at any time to meet any qualification for which issuance of the certificate could have been refused had the failure existed at the time of issuance and been known to Petitioner. *FS* § 626.891(2)(e).

In lieu of suspension or revocation, Petitioner may impose an administrative fine against Respondent. For a nonwillful violation, the fine may not exceed $1,000 per violation and $5,000 for all nonwillful violations arising from the same action. *FS* § 626.894(1) and (2). For a knowing and willful violation, the fine may not exceed $5,000 per violation and $25,000 for all knowing and willful violations arising out of the same action. *FS* § 626.894(1) and (3).

### D. *Burden of Proof*

Petitioner has the burden of proving its allegations by clear and convincing evidence. *Ferris v Turlington,* 510 SO.2d 292 (Fla. 1987).

The burden of proof as to an affirmative defense rests upon the party asserting it. *Hough v Menses,* 95 So.2d 410 (Fla. 1957). However, the preemption defense raised by Respondent pertains to subject matter jurisdiction and it not merely an affirmative defense or statutory exception. The defense of subject matter jurisdiction may be raised at any time, unlike an affirmative defense, which may be waived if not timely made. *See, e.g., Wooten v Collins,* 327 So.2d 795 (Fla. 3d DCA 1976). The burden rests on Petitioner to show that the jurisdiction exists for the present proceeding. *Id.* (defendant's claim that plaintiff failed to satisfy threshold requirements of Florida No Fault Insurance Act not an affirmative defense; plaintiff has burden of proving that he satisfies all jurisdictional requirements). *But cf. Matthew 25 Ministries, Inc. v Corcoran,* 771 F.2d 21 (2d Cir. 1985) and *Baucom v Pilot Life Insurance Company,* 674 F. Supp. 1175 (M.D.N.C. 1987) (burden of proof on party seeking ERISA jurisdiction).

### II. *FEDERAL LAW*

### A. *Employee Welfare Benefit Plan*

The first substantive issue is whether a plan is covered by ERISA. If

181

it is not, the Act and other state law apply to a plan without question. However, if a plan is covered by ERISA, it is necessary to consider the extent to which ERISA may preempt the Act and other state law in this case.

ERISA applies to "employee benefit plans." 29 U.S.C. Section 1003(1). Consequently, the general ERISA preemption provision reaches only "employee benefit plans." 29 U.S.C. Section 1144(a).

As relevant to this case, an employee benefit plan is an "employee welfare benefit plan" (EWBP). An EWBP is: a) any plan, fund, or program; b) established or maintained by an "employer," "employee organization" (e.g., trade union), or both, to provide for the plan "participants"; c) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death, or unemployment. 29 U.S.C. Section 1002(1).

The Alarm Plan and Wrecker Plan are plans, funds, or programs providing benefits of the type described above. Their classification as an EWBP, and thus ERISA-covered "employee benefit plan," is dependent upon whether they have been established or maintained by an "employer" for its "participants." (Neither plan has been established or maintained by a labor union or other employee organization.)

An "employer" is not only "any person acting directly as an employer," but also any person acting "indirectly in the interest of an employer, in relation to an employee benefit plan, including a group or association of employers acting for an employer in such capacity." 29 U.S.C. Section 1002(5). A "participant" is an "employee or former employee of an employer, or any member or former member of an employee organization," who enjoys benefits from a plan covering employees of such employer or members of such employee organization. 29 U.S.C. Section 1002(7).

ERISA regulates the retirement income and welfare benefits of "employees." In the presence of an employer-employee or union-member relationship, ERISA preempts state law because the welfare benefits bear a closer resemblance to compensation paid to an employee than to insurance provided to an insured. Preemption is justified because the participant's status as an employee or union member, together with ERISA, adequately protect the participant's interest in his or her benefits. If there is little if any relationship between the participant and the plan sponsor, the benefits to which he or she may be entitled are not protected by any employment or union member status. Such benefits no longer resemble compensation, but are really insurance benefits, which require the more comprehensive regulation provided by state laws.

182

In *Wisconsin Education Association Insurance Trust v Iowa State Board of Public Instruction,* 804 F.2d 1058 (8th Cir. 1986), the Wisconsin Education Association Insurance Trust, which was a group insurance trust maintained by several labor unions, failed to qualify as an EWBP. The trust provided coverage to members of the sponsoring unions and nonmembers who were employees of school districts with collective bargaining agreements with one of the sponsors. Thirty percent of the participants receiving benefits were nonmembers. The court held that ERISA did not preempt Iowa law because the trust was not an EWBP.

> The definition of an EWBP is grounded on the premises that the entity that maintains the plan and the individuals that benefit from the plan are tied by a *common economic or representation interest,* unrelated to the provision of benefits. (Emphasis supplied.) *Id.* at 1063.

Because the case involved sponsors that were unions, not employers, the court considered whether the union sponsors and participants had a common representation interest, unrelated to the provision of benefits. Finding none, the court state:

> The only relationship between the sponsoring labor union and these non-member recipients stems from the benefit plan itself. Such a relationship is similar to the relationship between a private insurance company, which is subject to myriad state insurance regulations, and the beneficiaries of a group insurance plan. *Id.*

Citing legislative history, the court concluded that "where a 'plan' is, in effect, an entrepreneurial venture it is outside the policy of [ERISA preemption]." *Id.* citing H.R.Rep. No. 1785, 94th Cong., 2d Sess. 48 (1977).

> Another court has noted similarly:

> The gist of ERISA's definitions of employer, employee organization, participant, and beneficiary is that a plan . . . falls within the ambit of ERISA only if the plan . . . covers ERISA participants because of their employee status in an employment relationship, and an employer or employee organization is the person that establishes or maintains the plan . . .

*Donovan v Dillingham,* 688 F.2d 1367 (11th Cir. 1982) *(en banc).*

In *Bell v Employee Security Benefit Association,* 437 F. Supp. 381 (D. Kan.1977), the court held that ERISA did not preempt state insurance laws. The employers sponsoring the plan had no voice in its management; thus, the plan was established and maintained by a third-

**183**

party entrepreneur, not am employer or union. The court also noted that the plan involved solicitation and was commercial in nature. Marketing and administering the plan was profitable for the insurance agency and the plan administrator—the latter receiving 22% of all premiums. The plan was intended to be actuarially sound, which is uncharacteristic of most forms of mere compensation.

## B. *MEWA Preemption Provisions in ERISA*

If a plan is an EWBP, Petitioner must, in proving that the plan is subject to the Act, show that the Act has not been preempted by ERISA. For the reasons set forth below, provisions of the Act have not been preempted.

As originally enacted, ERISA contained a complex series of preemption provisions. 29 U.S.C. Section 1144(1) and (b)(2)(A) and (B). In 1982, Congress enacted new preemption provisions as to MEWA's. The new provisions, override the original broad preemption provisions and preempt less state law. 29 U.S.C. Section 1144(b)(6). The new provisions, which are limited to MEWA's, save the Act from preemption in this case. It is thus unnecessary to consider whether the Act would be preempted under the original preemption provisions.

The MEWA preemption provisions define a MEWA in the same language as does the Act. The new law divides MEWA's into two types: MEWA's that are fully insured or granted exemptions from the Secretary of Labor ("Insured MEWA's") and all other MEWA's ("Noninsured MEWA's").

Insured MEWA's are subject to:

[a]ny law of any State which regulates insurance . . . to the extent that such law provides . . . standards, requiring the maintenance of specified levels of reserves and specified levels of contributions, which any such plan or . . . trust . . . must meet in order to be considered under such law able to pay benefits in full when due, and . . . provisions to enforce such standards.

29 U.S.C. Section 1144(b)(5)(A)(i).

Noninsured MEWA's are subject to "any law of any State which regulates insurance . . . to the extent not inconsistent with [29 U.S.C. Sections 1001-1143]." 29 U.S.C. Section 1144(B)(6)(A)(ii).

The Alarm Plan and Wrecker Plan are MEWA's. Respondent's argument that they are not MEWA's is untimely and unpersuasive. In its Answer to Administrative Complaint and Petition for Formal Proceedings Before the Division of Administrative Hearings served on

184

December 18, 1987, Respondent conceded that the Alarm Plan and Wrecker Plan were MEWA's.

In any event, Respondent's argument that a single trade association representing multiple employers fails to satisfy the MEWA requirement of "two or more employers" is not persuasive. Respondent argues that the employer members of the association be ignored when determining whether there are two or more "employers"—i.e., trade associations. However, the multiple-employer requirement is satisfied by the employer members of the association. A contrary result would in any event mean that the Alarm Plan and Wrecker Plan are not EWBP's because the participating employees are not employees of the sponsoring "employer"—i.e., the associations. For the same reasons, discussed below, that the participating employees may be employees of the employer enrollees, and are not limited to employees of the sponsoring association, so may the multiple-employer requirement be satisfied by the presence of two or more employer enrollees, which are members of the sponsoring association.

Because the Alarm Plan and Wrecker Plans are neither fully insured nor exempted by the Secretary of Labor, they are Noninsured MEWA's. Two sources are useful in interpreting the preemption language of 29 U.S.C. Section 1144(b)(6)(A)(ii).

First, the scope of Section 1144(b)(6)(A)(ii) may be inferred from the scope of Section 1144(b)(6)(A)(i). The subsection applicable to Insured MEWA's preempts more state law because MEWA's in this category are either fully insured or have been reviewed and exempted by the Secretary. As such, they are less in need of state regulation because they pose less risk of insolvency than Noninsured MEWA's. Thus, the state insurance law remaining after the application of the preemption provision in Section 1144(b)(6)(A)(i) surely remains after the application of the preemption provision in Section 1144(b)(6)(A)(ii), which controls less-favored Noninsured MEWA's.

Also, Congress makes it clear in Section 1144(b)(6)(A)(i) that state law "regulating insurance" includes standards setting reserves and contribution rates, as well as provisions enforcing such standards. Moreover, the language of Section 1144(b)(6)(A)(i) referring to "contributions" instead of "premiums" means that state law "regulating insurance" reaches EWBP's, such as the Alarm Plan and Wrecker Plan, and not just insurance contracts or policies. Insurance policies are funded by "premiums"; EWBP's are funded by "contributions."

Second, the scope of Section 1144(b)(6)(A)(ii) may be inferred from the legislative history of the MEWA preemption provisions. Congress

185

intended that the MEWA amendments to ERISA solve a serious problem confronting the private employee benefit plan industry. Respondent's restrictive interpretation of the statutory language would defeat the legislative intent, as expressed in the following passage:

. . . Many of you are aware of the serious problems caused by the failure of certain health insurance trust (also called multiple employer insurance trusts or MET's) to pay beneficiaries claims.

Although . . . ERISA was enacted to protect workers, some individuals have used ERISA as a smoke screen to conceal fraudulent activities.

These individuals approach employers, particularly small businesses, offering a cheaper alternative to traditional group health insurance coverage.

They set up trusts which they administer themselves to provide health coverage. But unlike licensed insurance carriers, they often fail to comply with the basic solvency controls which each state establishes to protect health care consumers.

When the State tries to enforce these controls, the trusts claim to be beyond the reach of State law because they are "employee benefit plans" covered by Federal law.

But by the time the U.S. Department of Labor decides if Federal law applies, the individuals who established the bogus insurance ventures have long since departed with the money and workers are left without any means of covering their unpaid legal bills.

[29 U.S.C. Section 1144(b)(6)(A)] clarifies and strengthens the ability of the States to protect their citizens from such unscrupulous individuals by giving the State clear authority to establish and enforce standards for MET's.

Health insurance is of critical importance to workers and their families. The average worker is clearly unable to meet spiraling medical costs without that protection.

Both of the premium payers (employers, as well as employees) are entitled to rely on the fact that the health insurance which they have purchased will be there when it is needed.

If problems in delivery of health insurance arise, the States must be able to step in immediately to protect consumers.

128 Cong. Rec. H9609 (1982) (remarks of Rep. Burton).

Congress intended that the scope of permitted state regulation of

186

MEWA's be broad, so as to permit timely elimination of perceived abuses.

> [T]he amendment removes any potential obstacle that might exist under current law which could hinder the ability of the States to regulate [MEWA's] to assure the financial soundness and timely payments of benefits under such arrangements.

128 Cong. Rec. H9610 (1982) (remarks of Rep. Erlenborn).

The Supreme Court has twice considered the meaning of the phrase, "any law of any State which regulates insurance," in the context of one of the originally enacted preemption provisions, which is known as the "saving" clause. This clause establishes an exception to the general ERISA preemption provision, so that a state law within the saving clause is "saved" from preemption. In *Metropolitan Life Insurance Company v Massachusetts,* 471 U.S. 724, 105 S. Ct. 2380, 85 L.Ed. 2d 728 (1985), the Court held that the language of the saving clause reached a state statute mandating certain minimum benefits in insurance contracts. Thus, the state law could require the inclusion of such coverage in insurance policies sold to EWBP's, although not to the plans themselves. In *Pilot Life Insurance Company v Dedeaux,* — U.S. —, 207 S.Ct. 1549, 95 L.Ed. 2d 39 (1987), the Court held that the language of the saving clause did not reach a Mississippi law of bad faith or tortious breach of contract so as to "save" that remedy from ERISA preemption. Thus, the ERISA civil enforcement provisions were preserved as the exclusive means by which a claimant could enforce his or her right to benefits.

*Metropolitan Life* and *Pilot Life* omit mention of Section 1144(b)(6)(A), which evidently did not govern the facts of either case. Congress of course chose the language in Section 1144(b)(6)(A) before the Court interpreted the identical language of the saving clause. However, the reasoning of the Court in interpreting this language must be noted.

In both cases, the Court first took a "common-sense view" of the statutory language. In *Pilot Life,* the Court concluded that "regulates" means that the law "must not just have an impact on the insurance industry, but be specifically directed toward that industry." 107 S. Ct. at 1554. In both cases, the Court then interpreted the statutory language in light of McCarran-Ferguson Act decisions interpreting the phrase, "business of insurance." 107 S.Ct. at 1553. This phrase is used in the so-called "deemer" clause that limits the saving clause, but not in the MEWA preemption provisions, which override the saving and deemer clauses. The Court identified three McCarran-Ferguson criteria

187

that the Act fails to satisfy because it is not directed toward the "business of insurance," but toward a certain class of EWBP's.

As the Court in *Pilot Life* acknowledged, however, legislative intent overshadows the "common-sense view" and McCarran-Ferguson factors. 107 S. Ct. at 1558. In the case of the MEWA preemption provisions, the statutory language and legislative intent dictate a result contrary to that suggested by the reasoning in *Metropolitan Life* and *Pilot Life.*

Because the Alarm Plan and Wrecker Plans are MEWA's and the Act is a state law "regulating insurance," the final issue is whether the Act is a law "not inconsistent" with 29 U.S.C. Sections 1001-1143.

EWBP's, such as MEWA's, are not subject to ERISA funding requirements, which are imposed on other types of employee benefit plans. 29 U.S.C. Section 1081(1). As a general principle, state law requiring minimum funding of EWBP's therefore is not inconsistent with ERISA. Such a conclusion is reinforced by Congress expressly subjecting Insured MEWA's to state laws governing reserves and contributions. To allow less-favored Noninsured MEWA's freedom from such state laws would be illogical.

It is unnecessary to determine whether the entire Act satisfies the consistence requirement of Section 1144(b)(6)(A)(ii). To establish that a plan violated the Act, Petitioner needs only to show that the provision of the Act violated by the plan is "not inconsistent" with 29 U.S.C. Sections 1001-1143.

*FS* § 624.438(4), requires that each plan must establish and maintain appropriate loss reserves that are determined in accordance with sound actuarial principles. *FS* § 624.439(7), requires that the plan sponsor file with Petitioner, *inter alia,* satisfactory evidence that the plan will be operated in accordance with sound actuarial principles. *FS* § 624.442(1), requires that each MEWA file an annual statement with a certified financial statement. These provisions are contemplated by § 1144(b)(6)(A)(i) and, for the reasons set forth above, are therefore within the scope of Section 1144(b)(6)(A)(ii).

Likewise, the requirement at FS § 624.441 that the plan annually deposit minimum security with Petitioner is also consistent with ERISA, at least as to EWBP's as to which ERISA funding standards are inapplicable. This is precisely the type of state law that Congress intended to remove from preemption in order to preserve the health benefits of participants and curb the abuses that were reported to it.

*FS* §§ 626.891(b)(b) and (2)(e), imposes professional standards of

188

conduct upon plan administrators, and *FS* § 626.894, provides the means by which to enforce these standards. These provisions clearly satisfy the requirement that they "regulate insurance." They probably fall within the meaning of Section 1144(b)(6)(A)(i), which preempts relatively more state law as to favored Insured MEWA's, because these state statutes are provisions under which state laws setting reserves and contributions are enforced.

Nor are the administrator provisions inconsistent with ERISA. Contrary to Respondent's assertions, these statutes do not conflict with the civil enforcement scheme contained in ERISA. The present case is not comparable to *Pilot Life* in which a beneficiary tried to sue the plan fiduciaries for nonpayment of benefits. In the present case, the Department of Insurance is bringing the proceeding. Moreover, the purpose of the proceeding is not to compel the payment of claims or even to require the fiduciaries to discharge their ERISA-mandated duties. The purpose is simply to enforce state laws designed to ensure that, through registration, periodic reporting, posting security, and maintaining actuarial soundness, a plan is able to meet its financial obligation to its participants. This is the very purpose of the MEWA preemption legislation. Limiting the enforcement of state insurance laws to the plan, trustees, and sponsor would invite widespread avoidance of the protections offered by the Act because of the inability of the state enforcement provisions to reach typically the most sophisticated party in a plan—the administrator. Such a situation would defeat the Congressional intent of the MEWS preemption provisions.

## III. *ALARM PLAN*

### 1. *Alarm Plan Is An EWBP*

Petitioner has failed to prove that the Alarm Plan is not an EWBP. The Alarm Plan satisfies the requirement that it be sponsored by an "employer"—i.e., Alarm—for "participants"—i.e., the employees of the employers who have enrolled in the Alarm Plan.

The Alarm Plan documents limit enrollment in the Alarm Plan to employers who are members of Alarm. The Alarm Plan is clear in this regard. The Alarm Trust Agreement is less clear, but may be interpreted consistent with the Alarm Plan. The Alarm Trust language pertaining to "Employee Contributions," when read together with the Alarm Plan, means contributions on behalf of employees and does not imply that employees may enroll. In practice, the Alarm Plan has been administered in a manner consistent with this interpretation because the only enrollees are employers.

It is not clear whether all of the enrollees are voting members of Alarm. If they are not, the Alarm Plan is not an EWBP. Although all of the enrollees may have been qualified for membership, the requirement is that they are voting members, not that they could be. However, the burden of proving the existence of nonvoting enrollees is upon Petitioner, and this burden has not been met.

The employees who participate in the Alarm Plan satisfy the definition of "participants." The participating employees are employed by enrolled employers. It is irrelevant that they are not employed by Alarm, which is the "employer" in fact sponsoring the Alarm Plan. There is no authority for giving an unnatural reading to the statute and limiting particpants in a plan sponsored by a trade association to employees of Alarm, and not its employer members.

Petitioner argues that Alarm and the Alarm Trustees have relinquished control over the Alarm Plan to Respondent and thus the Alarm Plan is no longer sponsored by an employer for its employees. In theory, Respondent could have *de facto* control of the Alarm Plan, even though the Alarm Plan documents vest ultimate control in Alarm. However, such evidence must overcome the fact that the enrollees control the Alarm Plan because they are voting members of Alarm, which controls the Alarm Trustees.

Petitioner's evidence fails to establish a *de facto* transfer of control. Respondent supplied the Alarm Plan documents and then administered the Alarm Plan for a fee while Respondent and the Alarm Trustees sought to make the Alarm Plan actuarially sound. Although these facts are consistent with a transfer of control, they are more suggestive of prudence on the part of the Alarm Trustees in discharging their fiduciary duties. As the Alarm Plan increased in size, the administrative complexity and claims exposure increased correspondingly.

The latitude extended Respondent in soliciting enrollees in the Alarm Plan and members of Alarm is evidence of the commercialization of the Alarm Plan, which suggests the presence of insurance rather than an employee benefit plan. This evidence is outweighed by the above-cited factors, as well as the critical fact that, notwithstanding Respondent's solicitation activities, Alarm does not appear to be a subterfuge or mere vehicle to provide a group insurance program. Alarm predated the Alarm Plan by nine years. The record does not permit an inference that the recent surge in Alarm membership was due solely to the availability of the Alarm Plan.

### B. *Alarm Plan Is A MEWA Subject To The Act.*

For the reasons set forth on pages 23-25 above, the Alarm Plan is a

190

MEWA subject to the above-cited provisions of the Act requiring that the Alarm Plan obtain a certificate of authority. The failure of the Alarm Plan to obtain a certificate of authority violated the Act.

## C. *Respondent Did Not Violate The Act.*

The Act penalizes any person "operating or maintaining" a MEWA without a certificate of authority. *FS* § 624.437(4)(a) and (b). These terms are not defined in the Act. The Act may be enforced against Alarm, which is the "employer" or "association" "maintaining" the plan under 29 U.S.C. Section 1002(1), and the Alarm Plan, which, as a legal entity under 29 U.S.C. Section 1132(d)(1), may be said to "operate" the arrangement.

Assuming that the meaning of "maintain" is the same in the Act and ERISA, the determination above that Alarm has not *de facto* transferred to Respondent control of the Alarm Plan suggests that Alarm, and not Respondent, maintains the Alarm Plan under the Act also.

The meaning of "operates" is more difficult to determine because it is not used in the corresponding section of ERISA. FS § 624.438(1)(c) requires as a precondition to a certificate of authority that the MEWA be "[o]perated pursuant to a trust agreement by . . . trustees which shall have complete fiscal control . . . and . . . be responsible for all operations . . ." Moreover, a trustee may not be an owner or employee of the plan's administrator. *Id.* FS § 626.88(1) describes the administrator's functions in terms of soliciting insurance and adjusting claims. These definitions at most provide only some support for distinguishing between the operational functions of a trustee and the administrative functions of an administrator.

More important, an expansive definition of "operates" could cause the Act to be preempted by ERISA. If the typical activities of a MEWA administrator are deemed to be operational, MEWA's will generally be ineligible to obtain certificates of authority under the Act. Such a situation would invite preemption of the entire Act by ERISA because of the inconsistency of the Act with ERISA. If the Act, as applied, broadly prohibits MEWA's from operating in Florida, the Act is inconsistent with one of the central policies underlying ERISA—i.e., the formation of private employee benefit plans. *Cf. Pilot Life Insurance Company v Dedeaux,* — U.S. —, 107 S. Ct. 1549, 1556, 95 L.Ed. 2d 39 (1987) (Mississippi law of bad faith preempted by ERISA civil enforcement provisions, which represent "a careful balancing of the need for prompt and fair claims settlement procedures against the

191

public interest in encouraging the formation of employee benefit plans").

Based on the foregoing, Respondent did not "operate or maintain" the Alarm Plan. It therefore is not subject to a fine or cease and desist order for the violation of the Act by the failure of the Alarm Plan to obtain a certificate of authority.

### D. *Respondent's Services To Alarm Plan Did Not Demonstrate Incompetence.*

Petitioner failed to prove that Respondent's services to the Alarm Plan, while it was operating unlawfully without a certificate of authority, demonstrated that Respondent or any of its principals were not competent, trustworthy, financially responsible, or of good personal and business reputation.

Although Respondent did not "operate" the Alarm Plan within the meaning of FS § 624.437(4)(a) and (b), Respondent was responsible for, *inter alia,* providing the Alarm Trustees with sound advice concerning matters such as compliance with the Act. In retrospect, Respondent erroneously believed that ERISA preempted the Act. However, the circumstances do not support Petitioner's allegations of incompetence in Respondent's erroneous belief and consequent failure to advise the Alarm Trustees to apply for a certificate of authority under the Act.

The Act is new and little pertinent case law is available. Respondent reasonably relied on advice of counsel that the Alarm Plan was an ERISA plan. The scope of the MEWA preemption provisions is not perfectly clear. Under the circumstances, the failure of Respondent to apply for a certificate of authority for the Alarm Plan is not proof of incompetence, untrustworthiness, poor reputation, or financial irresponsibility.

Based on the foregoing, Petitioner failed to prove that Respondent's services to the Alarm Plan were in violation of FS § 626.8805(4).

### E. *Respondent's Business Practices In Connection with Alarm Plan Did Not Render Its Further Transaction Of Business Hazardous Or Injurious.*

Based on the reasons set forth in the preceding section, Petitioner failed to prove that Respondent's business practices in connection with the Alarm Plan, while it was operating unlawfully without a certificate of authority, render Respondent's further transaction of business hazardous or injurious to the public.

192

## IV. *WRECKER PLAN*

### A. *Wrecker Plan Is Not An EWBP.*

Petitioner has proven that Wrecker Plan was not an EWBP. At least five entities that enrolled in the Wrecker Plan were not members of Wrecker. For the reasons set forth above, the failure of all of the enrollees of a plan to have a voice in its management precludes the plan from qualifying as an EWBP. ERISA preemption is therefore not an issue as to the Wrecker Plan.

### B. *Wrecker Plan Is A MEWA Subject To The Act.*

Even if the Wrecker Plan were an EWBP, for the reasons set forth on pages 26-35 above, the Wrecker Plan was a MEWA subject to the above-cited provisions of the Act requiring that the Wrecker Plan obtain a certificate of authority. The failure of the Wrecker Plan to obtain a certificate of authority violated the Act.

### C. *Respondent Did Not Violate The Act.*

Because of the presence of the enrolees who were not members of Wrecker, the Wrecker Plan was not established or maintained by an employer for its employees, and thus the Wrecker Plan is not an EWBP. The failure of the Wrecker Plan to qualify as an EWBP does not mean that Wrecker did not "operate or maintain" the plan; it only means that not all of the enrollees in the Wrecker Plan had a voice in the plan's management.

The question at this point is whether Respondent usurped the rights and duties normally belonging to the Wrecker Trustees to the degree that Respondent could be said to have "operated or maintained" the Wrecker Plan.

Respondent's activities with respect to the Alarm Plan were administrative and not operational. The only material difference in Respondent's activities as to the Wrecker Plan was not that it solicited enrolees in the Wrecker Plan and members of Wrecker, but that it solicited and enrolled in the plan enrollees that were not members of Wrecker.

This presents a closer question, but, on balance, Petitioner has failed to prove by clear and convincing evidence that Respondent "operated or maintained" the Wrecker Plan. Respondent is therefore not subject to a fine or cease and desist order for the violation of the Act by the failure of the Wrecker Plan to obtain a certificate of authority.

### D. *Respondent's Services To Wrecker Plan Demonstrated Incompetence.*

Petitioner proved by clear and convincing evidence the incompetence of Respondent in connection with the services that it provided to the Wrecker Plan and Wrecker Trust.

On May 22, 1986, Respondent filed for a certificate of authority under the Act for the Wrecker Plan. Nine months later, Respondent withdrew the application because of its inability or unwillingness to obtain a certified audit and actuarial study. Thirteen months after withdrawing the application, the Wrecker Plan was placed in receivership with Petitioner due to a deficiency of more than $150,000.

Respondent never obtained actuarial advice after about 1980. It had therefore navigated the actuarial seas by a wet thumb in the wind for several years by the time that it recommended the initial contribution rates for the Wrecker Plan in late 1984.

For whatever reason, Respondent knew that the Wrecker Plan was a MEWA that required a certificate of authority under the Act. Respondent also knew that in order to obtain and maintain a certificate of authority, the Wrecker Plan and Wrecker Trust would have to be shown to be actuarially sound. Respondent nevertheless administered the Wrecker Plan for 18 months before even applying for a certificate of authority for the plan. Actuarial supervision would not have ensured the solvency of the Wrecker Trust. However, it would likely have contributed to an earlier identification of the financial problems that later plagued the Wrecker Trust.

Certified financial statements, which Petitioner would have demanded once the Wrecker Plan had obtained a certificate of authority, would also have been important. Respondent did not demonstrate a firm comprehension of the Wrecker Trust's financial position when, within two weeks after its January, 1988, meeting with the Wrecker Trustees, Respondent raised its "estimate" of Wrecker Trust losses by 2 ½ times. Presumably, the misunderstanding of the Wrecker Trustees concerning Respondent's confusing uses of the term, "claims overpaid" would have been eliminated by the annual financial statements that would have been required once the Wrecker Plan had obtained a certificate of authority.

Respondent is not a guarantor of the solvency of any plan that it administers. However, the failure of Respondent to discharge its responsibilities to the Wrecker Plan harmed the Wrecker Plan and Wrecker Trust.

Based on the foregoing, Petitioner proved by clear and convincing

evidence that Respondent's services to the Wrecker Plan demonstrated its incompetence in violation of *FS* § 626.8805(4), which is grounds for discipline under *FS* § 626.891(2)(e).

E. *Respondent's Business Practices In Connection With Wrecker Plan Render Its Further Transaction Of Business Hazardous Or Injurious.*

Based on the reasons set forth in the preceding section, Petitioner proved by clear and convincing evidence that Respondent's business practices in connection with the Wrecker Plan render its further transaction of business hazardous or injurious to the public.

## V. *DISMANTLERS PLAN and INDEPENDENT PLAN*

A. *Respondent's Services To Dismantlers Plan And Independent Plan Demonstrated Incompetence.*

Respondent failed to discharge timely its responsibilities to the Dismantlers Plan and Independent Plan when it filed the annual statements for the two plans six and five months late, respectively. Respondent offered as its only excuse that the presence of Petitioner's auditors for five or six months prevented the timely filing. This excuse is partly discredited by the fact that the delays equaled or exceeded five months and the statements are not even due for four months after the end of the fiscal year. Moreover, there is no indication that Respondent even requested an extension, as provided by *FS* § 624.442(1).

Assuming that Respondent's financial records for each plan were in order, there was no reason why Respondent failed timely to send the books to the accountant for preparation of the certified statements that must accompany the annual statements. The annual statements themselves requires almost no effort on the part of Respondent to prepare.

The seriousness of the untimely filing of the annual staements is underscored by the financial condition of the two trusts, as disclosed by the annual statements that were finally filed. The Dismantlers Trust was being operated with little margin for error. The Independent Trust had a deficit of nearly $300,000.

In the case of the Independent Trust, the untimely filing of the annual statement for the Independent Trust also precluded timely review by Petitioner of the remedial rate increases that were disclosed by the trustee's letter accompanying the annual statement.

Respondent may not escape its responsibilities toward these plans by claiming that they are not MEWA's and thus were not subject to, *inter alia,* the filing requirements of the Act. First, the trustees in both cases elected to comply with the Act. Respondent's failure to comply is not

excused by its claim that compliance was not strictly necessary. The trustees may not have desired to take the risk of noncompliance, especially in view of the fact that it is a felony, under FS § 624.437(4)(c), for the trustees to violate the Act. The enrolled employers and participating employees may also have relied upon the protection of the Act. In any event, both of these plans are MEWA's.

Based on the foregoing, Petitioner proved by clear and convincing evidence that Respondent's services to the Dismantlers Plan and Independent Plan constituted separate demonstrations of Respondent's incompetence in separate violations of *FS* § 626.8805(4), which are grounds for discipline under *FS* § 626.891(2)(e).

### B. *Respondent's Business Practice In Connection With Dismantlers Plan Do Not Render Its Further Transaction Of Business Hazardous Or Injurious, But Its Business Practices In Connection With Independent Plan Render Its Further Transaction of Business Hazardous Or Injurious.*

During the period that the annual statements were due but unfiled, Respondent knew or should have known of the financial condition of the two trusts. Under the circumstances, Respondent's failure to file timely the annual statement of the Dismantlers Trust, which was in fair financial condition, was incompetent but not so serious as to render Respondent's further transaction of business hazardous or injurious. On the other hand, the poor financial condition of the Independent Trust rendered Respondent's failure to comply with the law more serious. Under the circumstances, Respondent's failure to file timely the annual statement of the Independent Trust was so serious as to render its further transaction of business hazardous or injurious.

### IV. *RV PLAN*

### A. *The Services Of Respondent Or Its Principals To RV Plan Demonstrated Incompetence Or Untrustworthiness.*

Dealers Insurance Company, not Respondent, issued the bond, delivered it to Respondent, and then failed to honor and cancelled it. However, Petitioner proved by clear and convincing evidence that the activities of Respondent's principals in this matter demonstrated incompetence and untrustworthiness.

The return of the bond to Respondent was strictly for administrative purposes and was in no way a precondition to the effectiveness or validity of the bond. The execution of the bond by the surety, together with its deliver to Respondent, marked the completion of the underwriting of the bond.

196

Dealers Insurance Company cancelled the bond when Mr. Vaughn and Ms. Bryan, in their capacity as employees of Respondent, learned of the imminent liquidation of the RV Plan and RV Trust. Notwithstanding the cancellation of the bond, neither Mr. Vaughn nor Ms. Bryan bothered to attempt to refund the $1000 to the RV Trustees or RV.

Respondent was not required to obtain a bond for the RV Trust. If circumstances prevented the issuance of a bond to the RV Plan and RV Trust, Respondent was not required somehow to produce one. However, Mr. Vaughn and Ms. Bryan elected to have Dealers Insurance Company issue the bond. When they did so, they placed themselves in a sensitive position. Once the bond was issued, the risk of loss as to the $100,000, pursuant to the provisions of the bond, was shared by Dealers Insurance Company, as surety.

The efforts of Mr. Vaughn and Ms. Bryan to assist Dealer Insurance Company to avoid liability under the bond evidenced their incompetence in failing to understand their responsibilities toward the RV Trust or, in the alternative, their untrustworthiness, if they understood their responsibilities and intentionally disregarded them.

Based on the foregoing, Petitioner proved by clear and convincing evidence that the services of Respondent's principals to the RV Plan demonstrated incompetence or untrustworthiness in violation of *FS* §§ 626.8805(4),which is grounds for discipline of Respondent under *FS* § 626.891(2)(e).

## B. *Respondent's Business Practices In Connection With RV Plan Do Not Render Its Further Transaction Of Business Hazardous Or Injurious.*

As set forth in the preceding section, Dealers Insurance Company, not Respondent, dishonored and cancelled the bond. Unlike FS § 626.8805(4), which covers the administrator and its principals, FS § 626.891(1) covers only the administrator.

Respondent is not accountable for every act or omission of Mr. Vaughn and Ms. Bryan, only those acts or omissions performed by these persons on behalf of Respondent. In dishonoring and cancelling the bond, Mr. Vaughn and Ms. Bryan obviously acted on behalf of the surety, not Respondent. As persons who are principals of Respondent, their actions, even though on behalf of the surety, could provide the basis, under the facts of this case, for disciplining Respondent under FS § 626.8805(4), but not under FS § 626.891(1).

At worst, Respondent exercised poor judgment in selecting Dealers

Insurance Company to issue the bond, but even that conclusion would improperly assume that Respondent had a choice in sureties.

Based on the foregoing, Petitioner failed to prove by clear and convincing evidence that Respondent's business practices in connection with the RV Plan render its further transaction of business hazardous or injurious.

## RECOMMENDATION

Based on the foregoing, it is recommended that Petitioner enter a final order:

1. Dismissing the first count of the Administrative Complaint;

2. As to the second count, dismissing the portion thereof alleging that Respondent violated *FS* § 624.437;

3. As to the second count, finding Respondent guilty of violating *FS* §§ 626.891(1)(b) and 626.891(2)(e), as to the latter, by virtue of a violation of FS § 626.8805(4);

4. As to the third count, dismissing the portion thereof alleging that Respondent violated FS § 626.891(1)(b);

5. As to the third count, finding Respondent guilty of violating FS § 626.891(2)(e), by virtue of a violation of FS § 626.8805(4);

6. As to the fourth count, finding Respondent guilty of violating FS §§ 626.891(1)(b) and 626.891(2)(b), as to the latter, by virtue of a violation of FS § 626.8805(4);

7. As to the fifth count, dismissing the portion thereof alleging that Respondent violated FS § 626.891(1)(b); and

8. As to the fifth count, finding Respondent guilty of violating FS § 626.891(2)(e), by virtue of a violation of FS § 626.8805(4).

Based on the foregoing, it is further recommended that the Final Order suspend the certificate of authority of Respondent, pursuant to FS § 626.893, for a period of three months from the effective date of the Final Order, for violation of FS § 626.891(1)(b), proven as to the second count; impose an administrative fine against Respondent in the total amount of $9000, representing $5000 for the willful violation of FS § 626.891(1)(b), proven as to the fourth count, and $1000 for each of the four violations of FS § 626.891(2)(e), proven as to the second, third, fourth, and fifth counts. Each of these violations is based on demonstrated incompetence, which, at least in this case, implies an ignorance that is inconsistent with a finding of willfulness.

DONE and RECOMMENDED this 13th day of June, 1988, in Tallahassee, Florida.